# In the United States Court of Federal Claims

No. 17-826L

(Filed: October 4, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ILLINOIS CENTRAL RAILROAD CO., | |
| Plaintiff, | Motion to Dismiss for Lack of Subject Matter Jurisdiction; Statute of Limitations; Accrual of Cause of Action; Stabilization Doctrine; Fifth Amendment Taking; Breach of Contract. |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bradley R. Belsome*, with whom was *Michael C. Mims*, Bradley Murchison Kelly & Shea, LLC, New Orleans, Louisiana, for Plaintiff.

*Edward C. Thomas,* Senior Attorney, with whom was *Jeffrey H. Wood*, Acting Assistant Attorney General, Environmental & Natural Resources Division, U.S. Department of Justice, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

Plaintiff Illinois Central Railroad Company ("IC") brings this action after the United States Army Corps of Engineers allegedly damaged two of IC's railroad bridges near New Orleans by permitting the Bonnet Carré Spillway to operate with a flowage rate above 250,000 cubic feet per second in violation of the Corps' easement. In its complaint, IC claims that the Corps' actions constituted a taking without just compensation (Counts I and II) and a breach of contract (Count III).

Currently before the Court is Defendant's motion to dismiss IC's complaint for lack of subject matter jurisdiction. Dkt. No. 14. In its motion, the Government argued that the Court lacks subject matter jurisdiction to hear Plaintiff's claims because IC failed to timely file its complaint within the six-year statute of limitations period. See Def.'s Mot. at 1.

For the reasons explained below, the Court DENIES Defendant's motion to dismiss on Counts I and II, and GRANTS Defendant's motion to dismiss on Count III.

Background[1]

Congress enacted the Flood Control Act of 1928, 33 U.S.C. § 702a *et seq.*, in order to prevent flooding across the United States. Compl. ¶¶ 13-14. Pursuant to that legislation, Congress authorized construction of individual flood control projects nationwide. Id. ¶ 14. The Bonnet Carré Spillway was one such project. Id. ¶ 15. This spillway was intended to divert water from the Mississippi River to reduce flowage rates as the river approached New Orleans, Louisiana, thereby reducing the risk of flooding in the city. Id. ¶¶ 29-36. When water levels on the Mississippi are high enough to raise flooding concerns, the Corps of Engineers floods the land within the spillway. Id.

Before construction of the spillway could begin, the Corps had to secure rights to the land that would be flooded. Id. ¶¶ 19-21. At the time, IC and the Yazoo & Mississippi Valley Railroad ("Yazoo") held rights of way for their railway lines operating in this area. Id. ¶ 19. Accordingly, on January 9, 1934, the Government initiated two condemnation actions in the Eastern District of Louisiana seeking flowage easements over IC's and Yazoo's rights of way. Id. ¶ 21. The Government, IC, and Yazoo then entered into negotiations of the terms. Id. The parties ultimately filed a stipulation with the district court granting the easements with the condition that the discharge rate in the spillway did not exceed 250,000 cubic feet per second. Id. ¶¶ 24-25. In return, the stipulation outlined that the Government would provide compensation for IC and Yazoo to construct timber trestle bridges designed to withstand water discharge up to 250,000 cubic feet per second. Id. ¶¶ 25, 27. The Government also agreed to provide compensation to maintain these railways in as good of a condition as they were in before these alterations. Id. ¶ 25.

On November 9, 1934, the district court entered judgment pursuant to the stipulation's terms. Id. ¶ 26. IC and Yazoo subsequently built two bridges, the McComb Bridge and Yazoo Bridge, over the land within the spillway. Id. ¶ 28. IC has since acquired Yazoo and now operates Yazoo's former railways including those lines that fall within the spillway. Id. ¶ 20.

In early May 2011, the Ohio and Mississippi River Valleys experienced unusually heavy rainfall, which raised the water levels in the Mississippi River. Id. ¶ 39. To manage the river's volume, the Corps opened the spillway from May 9, 2011 into June 2011. Id. ¶¶ 40- 41. At certain times during this period, the Corps permitted the spillway to operate with a flowage rate in excess of 250,000 cubic feet per second. Id. ¶ 42. After the Corps closed the spillway, IC inspected its bridges and discovered that they had been seriously

---

[1] The Court draws the facts as stated in the Background section of this Opinion from IC's complaint, cited herein as "Compl."

damaged. Id. ¶ 43. IC maintains that it was unaware of and could not determine the extent of the damage to the bridges until sometime after the damage was done. Id.

Procedural History

Plaintiff filed its complaint in this Court on June 19, 2017. Dkt. No. 1. Approximately three months later, on September 18, 2017, Defendant filed its answer. Dkt. No. 8. The Court issued its first discovery scheduling order on November 14, 2017. Dkt. No. 11. On April 5, 2018, the Court amended that order as to the discovery and briefing schedule on the statute of limitations issue only. Dkt. No. 13. On June 18, 2018, Defendant filed a motion to dismiss pursuant to Rule 12(b)(1). Dkt. No. 14. Plaintiff filed its response on July 18, 2018, and Defendant filed its reply on August 24, 2018. Dkt. Nos. 15, 18. The Court heard oral argument on Defendant's motion on September 24, 2018.

Discussion

I. Standard of Review

    a. Motion to Dismiss

Jurisdiction is a threshold matter to be addressed in any case. When deciding a Rule 12(b)(1) motion to dismiss, a court must assume all the undisputed facts in the complaint are true and draw reasonable inferences in the non-movant's favor. Erikson v. Pardus, 551 U.S. 89, 94 (2007). However, a plaintiff must establish that jurisdiction exists (that is, that the action was timely filed) "by a preponderance of the evidence." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010). In determining whether a plaintiff has met this burden, the Court may look "beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists." Lechliter v. United States, 70 Fed. Cl. 536, 543 (2006) (quoting Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991)). If the Court finds that it lacks subject matter jurisdiction, it must dismiss the claim. Gluck v. United States, 84 Fed. Cl. 609, 614 (2008).

    b. Statute of Limitations

IC brought this action under the Tucker Act, 28 U.S.C. § 1491(a)(1), and therefore must file within six years of the date on which its claims accrued. 28 U.S.C. § 2501; see also Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988). The six-year limitations period is a jurisdictional requirement which must be strictly construed. Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 404 (1994). IC filed its complaint on June 19, 2017. See Dkt. No. 1. To survive a motion to dismiss, IC must show that each of its claims accrued on or after June 19, 2011.

3

c. Claim Accrual

A claim typically accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." Hopland Band, 855 F.2d at 1577. "[W]hether the pertinent events have occurred is determined under an objective standard." Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995). A plaintiff therefore need not have actual knowledge of the relevant facts triggering accrual. Id.

d. Accrual for Takings by a Gradual Physical Process

In unique circumstances, the Government may take property "by a gradual physical process rather than a discrete action . . . such as a condemnation or regulation." Mildenberger v. United States, 643 F.3d 938, 945 (Fed. Cir. 2011). Takings by a "discrete action" establish a more precise date for the taking and for claim accrual. Takings by a physical process introduces uncertainty into fixing the date of the taking, thus placing on the property owner the "onus of determining the decisive moment in the process of acquisition by the United States when the fact of a taking could no longer be in controversy." United States v. Dickinson, 331 U.S. 745, 748 (1947). The Supreme Court in Dickinson recognized the potential for uncertainty inherent in takings by a physical process and, in those situations, "discouraged the strict application of accrual principles." Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000) (citing Dickinson, 331 U.S. at 748). Accordingly, the Supreme Court laid out a new standard: a claim for a taking by a gradual physical process does not accrue "until the situation becomes stabilized." Dickinson, 331 U.S. at 749.

Under this "stabilization doctrine" established in Dickinson and its progeny, such a claim accrues and the statute of limitations begins to run "once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable." Boling, 220 F.3d at 1371. The test is for reasonable foreseeability; it is "not necessary that damages from the alleged taking be complete and fully calculable before the cause of action accrues." Fallini, 56 F.3d at 1382.

II. Analysis

a. IC Has Met its Burden of Pleading Subject Matter Jurisdiction Over its Takings Claims.

The Government advocates that this case should not be analyzed pursuant to the stabilization doctrine, but rather under the general accrual standard detailed in Hopland Band. The Government maintains that the flowage rate in the spillway exceeded 250,000 cubic feet per second from May 14, 2011 to June 3, 2011, and IC knew about the excessive flow on these same dates. Using the Hopland Band standard, the Government asserts that

IC's claim accrued within that approximately three-week period. IC contends that the facts before the Court support the stabilization doctrine analysis. Using that standard, though the bridges were damaged between May 14, 2011 and June 3, 2011, the extent of the damage was not reasonably foreseeable until IC could inspect them, which was impossible until on or after June 19, 2011. Its takings claims, IC asserts, accrued on or after that date. The Court agrees.

IC alleges a taking by flooding. The damages from the flood could not be ascertained due to the nature of the taking until after the taking occurred. IC's takings claims are thereby entitled to the less exacting stabilization doctrine accrual standard.

IC could not foresee the extent of the damage to its bridges before it could perform an inspection. The Government flooded the spillway at a flowage rate above 250,000 cubic feet per second between May 14, 2011 and June 3, 2011. On May 27, 2011, IC examined the McComb Bridge's exposed portions by "snooper truck" and did not discover any damage. However, this method did not include an investigation of the underwater conditions. That examination required sending divers into the spillway which was not possible while the spillway remained open because the Corps directed IC not to interfere with the flow through the spillway and the high flowage rate presented too great a safety concern to the divers. Nevertheless, IC began contacting vendors to arrange for underwater inspections. On June 14, 2011, IC told the Corps that it intended to perform that inspection. In response, the Corps alerted IC that it needed to first acquire a Special Use Permit.

Without the ability to examine both the exposed and underwater portions of its bridges, IC could not have reasonably foreseen the extent of the damage to the bridges. While the spillway was open, IC was constrained in what types of inspections it could perform given the then-existing dangerous conditions within the spillway, the Corps' directive not to interfere with the spillway, and IC's lack of a necessary permit to perform further inspections. During this period, IC did those inspections that were possible. Inspections did not reveal any further damage. Moreover, there is no indication that IC could have done more to understand whether additional damage was sustained.

On June 20, 2011, the Corps closed the spillway but had not yet issued IC's permit. On June 22, 2011, in order to investigate (albeit incompletely) whether there was underwater damage without entering the water, IC roughly measured the water depth around the bridges. It used that measurement to approximate damage. This testing revealed possible extensive "scouring" to the bridges.[2] The Corps granted IC's permit on June 28, 2011, and dive inspections began the next day. Divers confirmed IC's initial estimation that both bridges had sustained extensive scouring damage.

---

[2] Scouring is the process by which the earth holding a bridge's trestle pilings in place erodes away.

The Corps closed the spillway on June 20, 2011 and issued IC's permit on June 28, 2011. IC was then able to inspect the bridges. A takings cause of action could not have accrued until IC was able to evaluate the extent of the damage to the bridges. Such an evaluation was impossible until sometime after June 19, 2011 when IC could examine both the exposed and underwater portions of the bridges. Setting the date of accrual after June 19, 2011 merely provides IC with the opportunity to inspect its property and ascertain the damage. It does not unduly extend the accrual period until IC's damages are "complete and fully calculable."

The Court also is unconvinced by Defendant's argument that IC's knowledge of the damage to the McComb Bridge caused by a May 22, 2011 debris strike triggered accrual. Notice of some, limited damage does not by itself instill awareness of the extent of the damages. See Forsgren v. United States, 64 Fed. Cl. 456, 459 (2005) ("[S]imply foreseeing the damage is not the test for accrual. Instead, accrual occurs when Plaintiffs should have reasonably foreseen the *extent* of the damage to their property.") (emphasis in original). Accordingly, "causes of action for different types of flood damage may accrue at different times." McDonald v. United States, 37 Fed. Cl. 110, 114 (1997), aff'd, 135 F.3d 778 (Fed. Cir. 1998) (citing Chipps v. United States, 19 Cl. Ct. 201, 207, aff'd mem., 915 F.2d 1585 (Fed. Cir. 1990)).

The May 22, 2011 debris strike to the McComb Bridge gave IC notice of that limited type of damage but not of the extent of the damage. The debris strike, subsequent repairs, and snooper truck inspection did not lead to any indication that the McComb Bridge sustained more extensive damage. While IC only inspected the exposed portions, it was limited by constraining physical conditions and Corps-imposed restrictions. Given IC's inability to investigate underwater conditions and the lack of indication of further damage after its initial external inspection, IC could not have reasonably foreseen the scouring damage.

Accordingly, IC's takings claims accrued after June 19, 2011. Finding otherwise would improperly require IC to "resort either to piecemeal or to premature litigation." Dickinson, 331 F.2d at 749. The Court denies the Government's motion to dismiss IC's claims in Counts I and II.

      b. <u>IC Has Not Met its Burden of Pleading Subject Matter Jurisdiction Over its Contract Claim.</u>

The Government argues that IC's breach of contract claim accrued on the date of the breach. In response, IC makes the same argument for later accrual on this claim as it does on the takings claims: the cause of action did not accrue until it could reasonably

foresee the extent of the damage done to the bridges (which was on or after June 19, 2011). The Court agrees with the Government.

The parties agreed that the stipulation negotiated during the 1934 condemnation proceedings capping the flowage rate at 250,000 cubic feet per second constituted a contract between IC and the Government. IC alleges that the Corps operated the spillway at a rate above 250,000 cubic feet per second between May 14, 2011 and June 3, 2011 in violation of that contract. Press releases, news coverage, and websites detailing the flowage rates on those days were circulated between May 14, 2011 and June 3, 2011. Accordingly, IC knew or should have known that the flowage rates exceeded 250,000 cubic feet per second on those very same dates. Put differently, IC was on notice of the breach when the breach occurred. All events required to assert a breach of contract claim were fixed at least by the time the breach ended on June 3, 2011. Therefore, June 3, 2011 is the latest possible date upon which a claim for breach of contract could have accrued. See Higgins v. United States, 589 F. App'x 977, 980 (Fed. Cir. 2014).

Adding six years to that date results in a June 3, 2017 filing deadline. IC's complaint filed on June 19, 2017 falls outside of that six-year window for the breach of contract claim. The Court therefore does not have subject matter jurisdiction to hear IC's claim. Count III of the complaint is dismissed.

## Conclusion

For the reasons stated above, the Court DENIES Defendant's motion to dismiss on Counts I and II, and GRANTS Defendant's motion to dismiss on Count III. No costs.

IT IS SO ORDERED.

                                                                         s/ Thomas C. Wheeler
                                                                         THOMAS C. WHEELER
                                                                         Judge